AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Information associated with telephone number<br>937-818-1476 that is stored at premises controlled by<br>Sprint Corporation | )<br>)<br>)<br>)<br>)<br>) Case No.  3 : 16 mj 315 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-4

located in the _____ District of _____Kansas_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-4

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| See Attachment C-4 | |

The application is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Andrea R. Kinzig, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 10/26/16  155 pm

City and state:  Dayton, Ohio

_____
*Judge's signature*

Michael J. Newman, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Andrea R. Kinzig, being duly sworn, depose and state as follows:

1. I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI), and have been so employed since 2005. I am currently assigned to the Dayton, Ohio Resident Agency of the Cincinnati Field Office. In connection with my official duties, I investigate violations of federal criminal laws, including offenses involving kidnapping, interstate theft, controlled substances, and firearms.

2. Along with other officers of the Vandalia (Ohio) Police Department, Richmond (Indiana) Police Department, and Miami Township (Ohio) Police Department, I am currently involved in an investigation of kidnapping, interstate theft, controlled substances, and firearms offenses committed by JAMES R. MARRIOTT (hereinafter referred to as "MARRIOTT"), ANDREW AZZALINA (hereinafter referred to as "AZZALINA"), and TAYLOR N. KARAS (hereinafter referred to as "KARAS"). I submit this Affidavit in support of Applications for search warrants for the following:

   a. Two black duffel bags and one cardboard box containing various items from the Extended Stay America Hotel, Room 308, 7851 Lois Circle, Miami Township, Ohio, 45459, collected by the Extended Stay America Hotel on October 7, 2016, and currently located in the Evidence Control Room of the Federal Bureau of Investigation, 7747 Clyo Road, Centerville, Ohio (hereinafter referred to as "**SUBJECT PROPERTY**" and more fully described in Attachment A-1);

   b. An Apple iPhone, Model A1349, EMC No. 2422, FCCID BCG-E2422A, currently located in the Evidence Control Room of the Federal Bureau of Investigation, 7747 Clyo Road, Centerville, Ohio (hereinafter referred to as "**SUBJECT TELEPHONE**" and more fully described in Attachment A-2);

   c. Information associated with telephone numbers **937-308-8902** and **937-405-8316** that is stored at premises controlled by Cellco Partnership LLP DBA Verizon Wireless, a company who accepts service of legal process at 180 Washington Valley Road, Bedminster, New Jersey, 079214 (more fully described in Attachment A-3);

   d. Information associated with telephone number **937-818-1476** that is stored at premises controlled by Sprint Corporation, a company who accepts service of legal process at 6480 Sprint Parkway, Overland Park, Kansas, 66251 (more fully described in Attachment A-4).

1

3. The purpose of the Applications is to seize evidence of violations of 18 U.S.C. §371 (Conspiracy), 18 U.S.C. §1201 (Kidnapping), 18 U.S.C. §924(c) (Use of a Firearm During and in Relation of a Crime of Violence), 18 U.S.C. §922(g) (Possession of a Firearm by a Prohibited Person), 18 U.S.C. §2312 (Interstate Transportation of Stolen Vehicles), 18 U.S.C. §2313 (Receipt, Possession, Storage, Concealment, Barter, Sale, and Disposal of Interstate Stolen Vehicles), 21 U.S.C. §844 (Possession of Controlled Substances), and 18 U.S.C. §1512 (Tampering with a Witness, Victim, or Informant). The items to be searched for and seized are described more particularly in Attachments B-1 through B-4.

4. As part of the investigation, I have reviewed documentation and reports provided by and discussed information with other officers involved in the investigation. For purposes of this Affidavit, I have not distinguished between information of which I have direct knowledge and that of which I have hearsay knowledge.

5. This Affidavit does not contain every fact known to the investigation, but only those deemed necessary to demonstrate sufficient probable cause to support the searches of the noted property, telephone, and accounts (as described in Attachments A-1 through A-4).

6. As a result of the instant investigation described more fully below, there is probable cause to believe that evidence, fruits, and instrumentalities of violations of federal law, including 18 U.S.C. §§ 371, 1201, 924(c), 922(g), 2312, 2313, and 1512 and 21 U.S.C. § 844 are present within the information associated with the noted property, telephone, and accounts (as described in Attachments A-1 through A-4).

## BACKGROUND INFORMATION:

### Cellular Telephones

7. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still

2

photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

d.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

e.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

Wireless Providers

8. In my training and experience, I have learned that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service. Cell-site data, also known as "tower/face information" or cell tower/sector records, identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. Based on my training and experience, I know that Verizon Wireless and Sprint Corporation can collect cell-site data.

9. Wireless phone providers typically retain certain transactional information about the use of each telephone, voicemail, and text-messaging account on their systems. This information can include log files and messaging logs showing all activity on the account, such as local and long distance telephone connection records, records of session times and durations, lists of all incoming and outgoing telephone numbers or e-mail addresses associated with particular telephone calls, voicemail messages, and text or multimedia messages. Providers may also have information about the dates, times, and methods of connecting associated with every communication in which a particular cellular device was involved.

10. Wireless providers may also retain text messaging logs that include specific information about text and multimedia messages sent or received from the account, such as the dates and times of the messages. A provider may also retain information about which cellular handset or device was associated with the account when the messages were sent or received. The provider could have this information because each cellular device has one or more unique identifiers embedded inside it. Depending upon the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Station Equipment Identity ("IMEI"). When a cellular device connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the cellular antenna or tower in order to obtain service, and the cellular antenna or tower records those identifiers as a matter of course.

11. Wireless providers also maintain business records and subscriber information for particular accounts. This information could include the subscribers' full names and addresses, the address to which any equipment was shipped, the date on which the account was opened, the length of service, the types of service utilized, the ESN or other unique identifier for the cellular device associated with the account, the subscribers' Social Security Numbers and dates of birth, all telephone numbers and other identifiers associated with the account, and a description of the services available to the account subscribers. In addition, wireless providers typically generate and retain billing records for each account, which may show all billable calls (including outgoing digits dialed). The providers may also have payment information for the account, including the dates

and times of payments and the means and source of payment (including any credit card or bank account number).

12. In some cases, wireless subscribers may communicate directly with a wireless provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Wireless providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

## FACTS SUPPORTING PROBABLE CAUSE

13. On October 6, 2016, officers of the Richmond Police Department responded to a Dick's Sporting Goods store in Richmond, Indiana, after receiving a call that a man was in duress and needed assistance. Upon arriving at the store, officers made contact with a 79-year old man who will be referred to for purposes of this Affidavit as "Adult Male A". Adult Male A reported that he had been held against his will and transported from Vandalia, Ohio to Richmond, Indiana by two men and one woman. Adult Male A identified the woman as KARAS, but he did not know the names of the two male subjects. According to Adult Male A, the three subjects had stolen various items from him and used or attempted to use his credit cards at various locations in Ohio before arriving in Indiana. Before officers arrived, the three subjects departed from the store with Adult Male A's vehicle.

14. After speaking to officers from the Richmond Police Department, Adult Male A returned to his residence in Clark County, Ohio. Adult Male A filed an additional report with the Vandalia Police Department, and he was interviewed on several occasions by officers involved in the investigation. In summary, Adult Male A provided the following information during the various interviews:

   a. Approximately six years ago, KARAS dated Adult Male A's grandson. For the past approximately one year, KARAS asked to borrow various amounts of money from Adult Male A. KARAS claimed to need the money for food and gasoline. Adult Male A loaned her various amounts of money, up to approximately $100. KARAS had re-paid the money on most of the previous occasions.

   b. During the early afternoon hours of October 6, 2016, KARAS sent Adult Male A a text message asking if she could borrow money from him. Adult Male A originally agreed to meet her at a restaurant to provide her with the money. KARAS later asked Adult Male A to meet her at the Super 8 hotel in Vandalia, Ohio. Adult Male A drove to the hotel in his 2008 Ford Explorer Sport Trac vehicle and met KARAS in room 124.

5

c.  Shortly after Adult Male A arrived at the hotel room, KARAS went into the bathroom for a long period of time. Two white males who will be referred to in the following sub-paragraphs as "SUBJECT-1" and "SUBJECT-2" then entered the hotel room. SUBJECT-1 had an off-black revolver in his hand and pointed it at Adult Male A. One of the subjects asked where the money was, and they both began searching through Adult Male A's belongings. The subjects made Adult Male A remove his pants so they could search the contents of his pockets. The subjects went through KARAS's purse as well, although it appeared to Adult Male A that they were not actually stealing anything from her. KARAS eventually came out of the bathroom, and Adult Male A thought she looked scared.

d.  After finding Adult Male A's credit card, SUBJECT-1 asked for its PIN number. Adult Male A did not know his PIN number and told this to SUBJECT-1. SUBJECT-1 called Adult Male A a liar, threatened to kill him, and cocked the gun.

e.  SUBJECT-1 said that they were going to go to an Automated Teller Machine (ATM) to get money, and he instructed KARAS to bring Adult Male A's vehicle over to the hotel room. At SUBJECT-1's instruction, Adult Male A got into the front passenger seat. SUBJECT-1 and KARAS got into the back seat, and SUBJECT-2 got into the driver's seat. SUBJECT-1 continued to hold the gun in his hand, and he pointed it at Adult Male A at various times. SUBJECT-2 asked for the gun at one point during the car ride so that he could shoot Adult Male A in the foot, but SUBJECT-1 did not give the gun to SUBJECT-2 at that time.

f.  SUBJECT-2 drove Adult Male A's vehicle to a Chase Bank in Englewood, Ohio. SUBJECT-1 attempted to get money out of the ATM but was unable to do so. He continued to ask Adult Male A for the PIN number for the credit card and threatened to kill Adult Male A if the PIN number was not provided. At one point while at the ATM or during the car ride, KARAS provided SUBJECT-1 with several possible numbers that could be the PIN number for Adult Male A's credit card.

g.  SUBJECT-2 continued driving and eventually pulled over on a gravel area at a ninety degree curve, somewhere in or around Eaton, Ohio. SUBJECT-1 and SUBJECT-2 accessed the trunk compartment of the vehicle and began going through Adult Male A's belongings. They threw a number of documents and

belongings out of the vehicle. As they drove away, SUBJECT-2 said he wanted to throw Adult Male A into a stone quarry that was nearby.

h. SUBJECT-2 drove to a Dollar General Store in or near Lewisburg, Ohio. SUBJECT-1 and KARAS went into the store to make a purchase. SUBJECT-1 gave SUBJECT-2 the revolver, and SUBJECT-2 remained in the vehicle with Adult Male A. SUBJECT-2 kept the revolver on his lap and told Adult Male A to stay in the vehicle.

i. SUBJECT-1 and KARAS returned to the vehicle, and SUBJECT-2 drove to Richmond, Indiana. SUBJECT-2 first said that he wanted to rent a rental vehicle and then said that he wanted to go to Dick's Sporting Goods store. SUBJECT-2 drove to the store, and SUBJECT-1 and KARAS again went into the store while SUBJECT-2 remained in the vehicle with Adult Male A. SUBJECT-2 told Adult Male A not to move and again kept the revolver on his lap.

j. SUBJECT-1 returned to the vehicle and told Adult Male A to come into the store to sign for the purchase. Adult Male A went into the store with SUBJECT-1. KARAS told SUBJECT-1 that he would be killed if he said anything.

k. The clerk needed Adult Male A's driver's license for the transaction, so SUBJECT-1 telephonically asked SUBJECT-2 to bring the license into the store. SUBJECT-2 gave Adult Male A the license at the store's entry doors. Adult Male A then signed for the transaction and put his driver's license and American Express credit card in his pocket. He mouthed to a store manager to call the police. SUBJECT-1 was nearby and could potentially have seen this occur.

l. Adult Male A asked to go to the bathroom, and SUBJECT-1 agreed. When Adult Male A came out of the bathroom, SUBJECT-1, SUBJECT-2, and KARAS had already left in Adult Male A's vehicle. Police officers arrived shortly thereafter, and Adult Male A provided a statement to the officers.

m. MARRIOTT had taken Adult Male A's cellular telephone from him sometime while they were at the Super 8 hotel. Adult Male A's cellular telephone number was **937-405-8316**.

n. Officers of the Miami Township Police Department later returned Adult Male A's vehicle and cellular telephone to him after they were recovered from a hotel (as detailed below). Adult Male A's garage door opener and key fob were no longer in the vehicle.

15. Throughout the course of the investigation (much of which is summarized below), Vandalia Police Department officers developed various suspects of SUBJECT-1's and SUBJECT-2's identities. Several photographic line-ups were shown to Adult Male A. When shown a line-up containing an older photograph of MARRIOTT, Adult Male A did not identify anyone in the line-up. When later shown another photographic line-up containing a recent photograph of MARRIOTT, Adult Male A identified the photograph of MARRIOTT as being SUBJECT-1 (although he expressed some reservation or doubt). When shown a photographic line-up containing a photograph of AZZALINA, Adult Male A identified AZZALINA as being SUBJECT-2.

16. On October 7, 2016, hotel management at the Super 8 hotel contacted the Vandalia Police Department and reported that they learned that the televisions for rooms 124 and 230 had been stolen. Officers were dispatched to the hotel to take a report. The following information was obtained during the course of the officers' investigation:

    a. Hotel management provided officers with registration paperwork for rooms 124 and 230. This paperwork identified that room 124 (the room where Adult Male A initially met KARAS) was rented in the name of KARAS, with an arrival date of October 6, 2016 and a departure date of October 7, 2016. Room 230 was rented in the name of Chris Burnett, with an arrival date of October 5, 2016 and a departure date of October 6, 2016.

    b. Officers encountered an adult female who will be referred to for purposes of this Affidavit as "Adult Female A" in room 230. Adult Female A was interviewed by officers and provided the following information:

        i. Adult Female A had learned from a friend that individuals who she knew as "JR" MARRIOTT, TAYLOR KARAS, and "Andrew" were involved in robbing a man. KARAS had purportedly called MARRIOTT and "Andrew" from the hotel room and told them that she knew someone they could rob.

        ii. Adult Female A was asked by her friend to clean up the Super 8 hotel room for any evidence left behind from the robbery. Adult Female A found a wallet that she believed belonged to the victim of the theft in the hotel room, and she disposed of it in a trash can at the bottom of one of the hotel's stairwells.

8

iii. MARRIOTT currently had Adult Female A's silver 22-caliber revolver. The revolver had a brown handle with "RG" on it.

iv. MARRIOTT utilized the alias "Chris Burnett".

v. MARRIOTT and KARAS were currently staying at a hotel by the Dayton Mall (in Miami Township, Ohio).

vi. AZZALINA's cellular telephone number was **937-818-1476**.

c. Officers searched the two hotel rooms and located three used syringes and a .40 caliber bullet in room 230. The bullet was located in the drain of the sink.

d. Officers searched the hotel's trash can at the location described by Adult Female A. The officer recovered a Dick's Sporting Goods bag containing a wallet with a card in Adult Male A's name.

17. Later on October 7, 2016, Adult Male A was notified by US Bank that someone had attempted to utilize his Visa credit card at an Extended Stay hotel. Detective Garry Lawson of the Vandalia Police Department contacted an employee of the Extended Stay America hotel in Miami Township, Ohio and inquired if a room was rented in MARRIOTT's or KARAS's name. The hotel employee identified that room 308 was currently rented in KARAS's name. The employee recalled seeing a male in this room and provided a description of the male's appearance. The description provided by the hotel employee was consistent with MARRIOTT's appearance.

18. It was determined that MARRIOTT had four outstanding warrants for his arrest for charges issued by the Courts of Common Pleas in Montgomery County, Ohio; Miami County, Ohio; and Greene County, Ohio. Based on the information obtained from Detective Lawson, officers of the Miami Township Police Department went to the Extended America Stay hotel on October 7, 2016 in an attempt to locate and arrest MARRIOTT for his outstanding warrants.

a. Officers located MARRIOTT and another adult male in room 308 of the hotel. During a search of MARRIOTT pursuant to his arrest, an officer located a US Bank Visa credit card in Adult Male A's name in a wallet in MARRIOTT's pant pocket.

b. A black duffel bag was sitting on a chair in close proximity to the location where MARRIOTT was arrested. When an officer moved the bag off of the chair, a pair

of black nylon dri-fit gloves fell and made loud noise when it hit the ground. The officer picked up the gloves and observed what appeared to be the handle of a gun coming out of the gloves. The item was removed, and it was identified as a Rohm GmbH revolver, Model RG23, 22-caliber, bearing serial number 49531, off-black in color with a brown handle. The revolver was loaded with approximately six rounds of ammunition, including one round in the chamber. The gun's appearance is consistent with the description Adult Male A provided of the gun used by MARRIOTT and AZZALINA during the kidnapping. The gun's appearance is also consistent with the description provided by Adult Female A of the gun she had given to MARRIOTT.

c. The officer searched the duffel bag and located a brown wallet containing KARAS's identification card. Officers also observed two Android cellular telephones on a dresser in the hotel room. The Android phones and the wallet were seized by officers and later booked into the Evidence Room at the Miami Township Police Department.

d. Officers also located Adult Male A's iPhone in the hotel room and his 2008 Ford Explorer Sport Trac vehicle parked on the east side of the hotel's parking lot.

e. MARRIOTT was transported to and booked into the Montgomery County (Ohio) Jail for his four outstanding warrants. Detective Lawson attempted to interview MARRIOTT, but MARRIOTT invoked his right to counsel.

19. On October 11, 2016, AZZALINA was arrested by an officer of the Eaton (Ohio) Police Department for a felony Grand Theft of a Motor Vehicle offense and a misdemeanor Criminal Damaging offense. He was booked into the Preble County (Ohio) Jail. A ZTE cellular was entered into AZZALINA's personal property at the Preble County Jail during the booking process.

20. On October 13, 2016, detectives of the Vandalia Police Department and Richmond Police Department contacted AZZALINA at the Preble County Jail. AZZALINA agreed to talk to the detectives after being advised of his Miranda rights. Detectives asked AZZALINA to describe what transpired when he, MARRIOTT, KARAS, and an elderly man (referring to Adult Male A) drove from the Super 8 hotel in Vandalia, Ohio to Dick's Sporting Goods Store in Richmond, Indiana. In summary, AZZALINA provided the following information throughout the interview:

a.  AZZALINA initially denied being in a vehicle with Adult Male A or having any knowledge of or involvement in the noted trip. AZZALINA also denied being at the Super 8 hotel.

b.  AZZALINA later acknowledged that he traveled with MARRIOTT, KARAS, and Adult Male A from Ohio to Indiana. AZZALINA acknowledged that he drove the vehicle for at least part of the trip. Consistent with the information provided by Adult Male A, AZZALINA reported that Adult Male A was in the front passenger seat and that MARRIOTT and KARAS were in the back seat.

c.  AZZALINA claimed that Adult Male A was never kidnapped or held against his will, but rather that Adult Male A had sex with KARAS in Ohio and was trying to pay her for the sexual activities. AZZALINA further claimed that because Adult Male A could not remember the PIN number for his credit card, he offered to buy MARRIOTT, KARAS, and AZZALINA clothing and other items.

d.  AZZALINA confirmed that they traveled to a Dollar General store, where MARRIOTT and KARAS purchased items. He acknowledged that they may have stopped at a bank, but he claimed to not recall anyone trying to withdraw money at an ATM. AZZALINA denied being involved in or having any knowledge of Adult Male A's belongings being thrown out of the car. AZZALINA rather claimed that Adult Male A went through his paperwork while in the vehicle and was worried about not being able to pay his traffic ticket.

e.  AZZALINA denied that anyone ever threatened to harm Adult Male A. AZZALINA first denied that there was ever a gun in the vehicle. AZZALINA later admitted that MARRIOTT had a revolver, and that MARRIOTT may have pointed it "out" at one point. However, AZZALINA denied that anyone ever threatened Adult Male A with the gun. AZZALINA further denied that he ever touched the gun.

f.  AZZALINA claimed that Adult Male A intended to give MARRIOTT and KARAS his vehicle. AZZALINA also claimed that Adult Male A intended to rent a vehicle in Indiana, and that AZZALINA was going to drive Adult Male A back to Ohio in the vehicle.

g.  AZZALINA stated that when they arrived at Dick's Sporting Goods Store in Richmond, Indiana, Adult Male A offered to buy everyone clothing. AZZALINA stated that he remained in the vehicle but went in for a brief period of time to pick out a backpack. AZZALINA claimed that when MARRIOTT and KARAS

11

returned to the vehicle, MARRIOTT said that Adult Male A was in the bathroom and that it was time to leave. AZZALINA claimed that he did not want to leave Adult Male A at the store but complied with the instructions to leave. They then drove back to Ohio in Adult Male A's vehicle.

h. AZZALINA requested to return to his jail cell, and the interview was terminated.

21. On October 19, 2016, KARAS was arrested by deputies of the Clark County (Ohio) Sheriff's Office pursuant to an arrest warrant authorized by the United States District Court of the Southern District of Ohio for violations of 18 U.S.C. §371 (Conspiracy), 18 U.S.C. §1201 (Kidnapping), 18 U.S.C. §924(c) (Use of a Firearm During and in Relation of a Crime of Violence), and 18 U.S.C. §2313 (Receipt, Possession, Storage, Concealment, Barter, Sale, and Disposal of Interstate Stolen Vehicles). On October 20, 2016, KARAS agreed to be interviewed by Detective Lawson and me after being advised of her Miranda rights. In summary, KARAS provided the following information during the interview:

a. KARAS and MARRIOTT had been involved in a romantic relationship for approximately one month. They often stayed together at various hotels. KARAS met AZZALINA through MARRIOTT. KARAS and MARRIOTT regularly used controlled substances, including methamphetamine.

b. On the day of the alleged kidnapping, KARAS was staying in room 124 at the Super 8 hotel in Vandalia, Ohio. MARRIOTT and various others, to include AZZALINA, were staying in a room on the second floor of the same Super 8 hotel.

c. KARAS confirmed that Adult Male A had been loaning or providing her money for some time. KARAS stated that Adult Male A had made comments or hints in the past indicating that he wanted to have a romantic relationship with her, but they never had a romantic or sexual relationship.

d. KARAS confirmed that she and Adult Male A made plans to go to lunch together on the day of the alleged kidnapping. They were originally going to meet at the restaurant, but they met at the Super 8 hotel instead so that KARAS could take a shower before leaving. KARAS stated that she told MARRIOTT that she was going to have lunch with Adult Male A, and MARRIOTT saw Adult Male A arrive at the hotel. However, KARAS denied making any plans with MARRIOTT and/or AZZALINA to rob or kidnap Adult Male A.

e.  After Adult Male A arrived at the hotel, she went into the bathroom.  KARAS
then heard MARRIOTT and AZZALINA talking to Adult Male A in the room.
KARAS came out of the bathroom, and MARRIOTT gave her a look that
frightened her.  KARAS claimed to be confused about what was transpiring.

f.  KARAS saw AZZALINA in Adult Male A's vehicle.  MARRIOTT then
announced that they would all go to lunch together, and everyone got into Adult
Male A's vehicle.  Similar to AZZALINA and Adult Male A, KARAS stated that
AZZALINA drove the vehicle, Adult Male A was in the front passenger's seat,
and KARAS and MARRIOTT were in the back seat.

g.  AZZALINA drove to various locations in Adult Male's car, but they never
stopped for lunch.  KARAS confirmed that they stopped at an ATM machine at a
bank in Englewood, Ohio.  KARAS claimed that AZZALINA tried to use Adult
Male A's credit card to withdraw money from the ATM, but that Adult Male A
gave AZZALINA permission to do so.  KARAS also confirmed that they stopped
at a Dollar Store where she and MARRIOTT purchased items with Adult Male
A's credit card, but she again claimed that Adult Male A consented for them to
use the credit card.

h.  KARAS originally denied knowledge that Adult Male A's belongings were
thrown out of the vehicle during the car ride.  She later acknowledged that
MARRIOTT and AZZALINA had thrown some of Adult Male A's paperwork
out of the car, but she claimed to not know why they did so.

i.  AZZALINA ultimately drove to a Dick's Sporting Goods Store in Indiana.
MARRIOTT told KARAS that he worked out an agreement with Adult Male A
where Adult Male A would buy them whatever they wanted.  Adult Male A came
into the store to purchase the items, and KARAS returned to the vehicle.

j.  MARRIOTT ultimately returned to the vehicle and said that Adult Male A went
to the bathroom.  KARAS stated that AZZALINA became nervous when he saw
someone talking on what appeared to be a radio at the store's entrance, and he
drove away.  KARAS claimed to not understand why they had to leave.  KARAS
acknowledged that Adult Male A did not give them permission to take his vehicle.

k.  KARAS stated that Adult Male A was never threatened at any time, and that no
one had a firearm at the hotel or while in Adult Male A's vehicle.  KARAS
claimed that she was often confused and did not understand what was happening.

l.  When shown a photograph of the Rohm GmbH Model RG23 22-caliber revolver seized pursuant to MARRIOTT's arrest, KARAS originally stated that she never saw this revolver. She later stated that she saw MARRIOTT with it after they returned to Ohio.

m.  KARAS stated that she never stayed at the Extended Stay America hotel, nor did she sign for the room's registration. KARAS learned that MARRIOTT had stayed at this hotel, and another female had signed KARAS's name when registering for the room.

n.  KARAS stated that she had an iPhone, and her cellular telephone number was **937-308-8902**. KARAS advised that text messages she exchanged with Adult Male A were still on her iPhone.

22. As part of the investigation, surveillance footage has been requested from the various locations where Adult Male A identified as being taken to by MARRIOTT, AZZALINA, and KARAS, as well as for the Extended Stay America where MARRIOTT was arrested. To-date, surveillance footage has been provided by the Dollar General Store in Lewisburg, Ohio; the Chase Bank in Englewood, Ohio; Dick's Sporting Goods Store in Richmond, Indiana; and the Extended Stay America in Miami Township, Ohio. The following information was obtained from review of this footage:

a.  Surveillance footage from the Chase Bank captured what appeared to be Adult Male A's vehicle at an ATM. The footage captured an individual appearing to be MARRIOTT leaning out of the rear driver's side of the vehicle and attempting to conduct a transaction at approximately 2:03 p.m.

b.  Surveillance footage from the Dollar General store captured two individuals appearing to be MARRIOTT and KARAS purchasing items at the cash register shortly after 3:00 p.m.

c.  Surveillance footage from the Dick's Sporting Goods store captured two individuals appearing to be MARRIOTT and KARAS walking around the store and putting various items into a shopping cart, beginning shortly after approximately 3:30 p.m. The footage thereafter captured Adult Male A entering the store and purchasing the items while MARRIOTT stood nearby. The items purchased included several items contained in orange Nike shoe boxes.

     d. Surveillance footage from the Extended Stay America hotel captured an individual appearing to be MARRIOTT and a female registering for a room shortly after approximately 11:00 p.m. on October 6, 2016.

23. Based on the information provided by Adult Male A about where MARRIOTT and AZZALINA disposed of his paperwork and belongings, Detective Lawson (with the assistance of a deputy from the Preble County Sheriff's Office) identified a possible location that matched the description – that being near the intersection of New Market Banta Road and Lexington Salem Road in West Alexandria, Ohio. Detective Lawson searched the area surrounding this intersection and located a number of documents and belongings scattered about the grass. These items included an Owner's Guide, Warranty Guide, registration paperwork, and other manuals for Adult Male A's vehicle; a traffic citation issued to Adult Male A; and various other documents with Adult Male A's or his wife's name on them. Detective Lawson also noted that there was a stone quarry near the intersection.

24. Pursuant to the consent of Adult Male A, a representative from US Bank verbally provided me with information about transactions that had cleared Adult Male A's Visa credit card on October 6 and 7, 2016. According to the information from the bank employee, the following transactions were made during the evening hours of October 6, 2016 (after Adult Male A was left at Dick's Sporting Goods): $5.58 transaction at Cite Mart in Beavercreek, Ohio and $7.22 and $1.38 transactions at Marathon Petrol in Dayton, Ohio. The following transactions were made on October 7, 2016: $20.34 transaction at Shell Gas Station in Beavercreek, Ohio and an attempted transaction that was declined at Extended Stay in Dayton, Ohio.

25. Review of MARRIOTT's criminal history and various court documents identified that he was previously convicted of the following felony offenses:

     a. In 2006, MARRIOTT pled guilty in the Clark County, Ohio Court of Common Pleas to one count of Possession of Drugs, in violation of Ohio Revised Code (O.R.C.) Section 2925.11 (pursuant to case number 06CR0490). He was originally sentenced to a term of community control, but after violating the terms of his probation, he was sentenced to 12 months imprisonment (to be served consecutively to the term imposed in case 07CR1114B).

     b. In 2007, MARRIOTT was convicted pursuant to a jury trial in the Clark County, Ohio Court of Common Pleas to two counts of Aggravated Burglary, in violation of O.R.C. Section 2911.11 (pursuant to case number 07CR1114B). He was sentenced to eight years imprisonment.

    c.  In 2016, MARRIOTT pled guilty in the Montgomery County, Ohio Court of Common Pleas to one count of Aggravated Possession of Drugs, in violation of O.R.C. 2925.11(A), and one count of Having Weapons While Under Disability, in violation of O.R.C. 2923.13(A)(2) (pursuant to case number 16CR0960). He failed to appear at his sentencing hearing, and a warrant was issued for his arrest in September 2016. He remained at large until he was arrested on October 7, 2016 (as detailed above).

26. Review of AZZALINA's criminal history and various court documents identified that he was previously convicted of the following felony offenses:

    a.  In 2013, AZZALINA pled guilty in the Preble County, Ohio Court of Common Pleas to one count of Complicity to Theft, in violation of O.R.C. Section 2923.03(A)(2) (pursuant to case number 13CR011242). He was sentenced to three years of community control.

    b.  In 2013, AZZALINA pled guilty in the Preble County, Ohio Court of Common Pleas to one count of Theft, in violation of O.R.C. Section 2913.02(A)(1) (pursuant to case number 13CR011265). He was sentenced to three years of community control.

    c.  In 2013, AZZALINA pled guilty in the Preble County, Ohio Court of Common Pleas to one count of Illegal Assembly or Possession of Chemicals for the Manufacture of Drugs, in violation of O.R.C. Section 2925.041(A) (pursuant to case number 13CR011299). He was sentenced to three years of community control.

    d.  In 2015, AZZALINA was arrested for violating the terms of his community control set forth in Preble County, Ohio Court of Common Please case numbers 13CR011242, 13CR011265, and 13CR011299 (as detailed above). He was thereafter sentenced to two years imprisonment.

    e.  In 2014, AZZALINA pled guilty in the Montgomery County, Ohio Court of Common Pleas to one count of Theft, in violation of O.R.C. Section 2913.02(A)(1), and one count of Tampering with Evidence, in violation of O.R.C. Section 2921.12(A)(1) (pursuant to case number 14CR00102/2). He was sentenced to five years of community control.

27. Based on the convictions detailed above, both MARRIOTT and AZZALINA were prohibited from possessing a firearm.

28. As part of the investigation, Special Agent (SA) Christopher Reed of the Bureau of Alcohol, Tobacco, Firearms, and Explosives was consulted regarding the Rohm GmbH Model RG23 22-caliber revolver. SA Reed informed me that revolvers of this make and model were manufactured outside the state of Ohio and therefore traveled in interstate commerce prior to being possessed by MARRIOTT and AZZALINA.

## SEIZURE OF SUBJECT PROPERTY

29. On October 19, 2016, I contacted management for the Extended Stay America hotel in Miami Township, Ohio. Management reported that numerous items were left in room 308 after MARRIOTT was arrested by officers of the Miami Township Police Department on October 7, 2016. The hotel employees observed what appeared to be a quantity of methamphetamine, ammunition, gun holsters, and suspected counterfeit currency throughout the room. One of the employees took a video recording of the room, and employees then packaged the items in two black duffel bags and a cardboard box. Within the following days, at least two individuals – one of whom identified herself as being MARRIOTT's mother – attempted to retrieve the belongings. Because the belongings contained illegal contraband, hotel management did not release the items.

30. I have reviewed the video recording taken by the hotel employee of room 308 prior to packaging the items, and I observed the following:

   a. A small clear rocky substance resembling methamphetamine;

   b. A bottle of propane and a bottle of butane (which I know, based on training and experience, to be common heat sources for the use of methamphetamine);

   c. Two gun holsters and various rounds of ammunition;

   d. Two one dollar bills that appeared to be counterfeit;

   e. Several orange Nike shoeboxes resembling those appearing in the surveillance footage from Dick's Sporting Goods Store in Richmond, Indiana (as detailed above);

   f. A garage door opener;

g.   Numerous other personal belongings.

31. Hotel management voluntarily turned over the two black duffel bags and cardboard box (the **SUBJECT PROPERTY**) to me on October 19, 2016. The **SUBJECT PROPERTY** was entered into the Evidence Control Room of the FBI's office located at 7747 Clyo Road, Centerville, Ohio, and has not been further accessed or searched at this time.

32. As noted above, Adult Male A's garage door opener and key fob were not in his vehicle when it was returned to him by officers of the Miami Township Police Department. As such, it is reasonable to believe that items belonging to Adult Male A may be in the **SUBJECT PROPERTY**. In addition, it is reasonable to believe that other items and records obtained during the alleged kidnapping of Adult Male A may be in the **SUBJECT PROPERTY**. Such items and records may include items purchased with Adult Male A's credit card (such as the items in the orange Nike shoe boxes) and receipts from the purchases.

33. Based on the items observed in the video recording and other information noted in this Affidavit, it is reasonable to believe that the **SUBJECT PROPERTY** contains various evidence of MARRIOTT's, AZZALINA's, and KARAS's criminal activities, including but not limited to quantities of controlled substances and paraphernalia; firearms, ammunition and accessories; items and/or records obtained in, used in, or reflective of the commission of criminal activities (to include kidnapping, interstate theft, firearms, controlled substances, and witness intimidation offenses). The items and records obtained in, used in, and reflective of the commission of criminal activities include but are not limited to cellular telephones; telephone bills and records; hotel records and receipts; credit card receipts and other financial documents reflective of payments made for travels; records, maps, and receipts related to travel; cameras and recording devices; and images and/or videos depicting victims, stolen vehicles and other items, controlled substances, firearms, or surroundings where criminal activities transpired.

34. While law enforcement might already have all necessary authority to examine the **SUBJECT PROPERTY** based on the consent of management at the Extended Stay America hotel, I seek this warrant out of an abundance of caution to be certain that the search will comply with the Fourth Amendment and other applicable laws.

## SEIZURE OF SUBJECT TELEPHONE

35. On October 24, 2016, KARAS's mother turned over to me a cellular telephone (**SUBJECT TELEPHONE**) that she identified as belonging to KARAS. She identified

that the telephone number for the **SUBJECT TELEPHONE** was **937-308-8902**. The mother reported that she had viewed the contents of the **SUBJECT TELEPHONE** and noted that it contained messages exchanged with Adult Male A as well as threatening communications from MARRIOTT's mother. KARAS's mother also reported that KARAS had asked her to delete all of the contents of the **SUBJECT TELEPHONE** except for the text messages she exchanged with Adult Male A. The mother advised that she did not comply with KARAS's request.

36. After receiving the **SUBJECT TELEPHONE** from KARAS's mother, it was secured in the Evidence Control Room of the FBI's office located at 7747 Clyo Road, Centerville, Ohio, 45459. It has not been searched at this time.

37. As detailed above, Adult Male A noted that MARRIOTT telephonically contacted AZZALINA while they were at the Dick's Sporting Goods store in Richmond, Indiana. Adult Female A also noted that KARAS had purportedly called MARRIOTT and AZZALINA from the Super 8 hotel room and told them about her idea to rob Adult Male A (again as further detailed above). It is therefore reasonable to believe MARRIOTT, AZZALINA, and KARAS used cellular telephones (to include **SUBJECT TELEPHONE**) in the commission of their criminal activities and brought these devices with them when they traveled from Ohio to Indiana.

38. Based on my training and experience, I know that individuals involved in kidnapping, controlled substances, firearms, and theft offenses often use a variety of electronic devices in the commission of the offenses. Offenders utilize cellular telephones (such as that described in Attachment A-2) to communicate with co-conspirators about various aspects of the criminal activities. Such communications include, among others, coordinating and planning for the kidnappings and thefts; discussing use of the proceeds from the thefts; discussing the purchase and use of controlled substances; and discussing the purchase and use of firearms. The communications may be in various forms, including telephone calls, text messages, email communications, and Internet and cellular telephone-based messenger applications.

39. Again based on my training and experience, I know that offenders often utilize cellular telephones to conduct Internet searches related to their criminal activities. Such Internet searches may include searching for maps and directions to the locations of the criminal activities (such as locations of the kidnappings, thefts, and locations where controlled substances and firearms are purchased or used), researching the retail value of vehicles and other stolen items, and researching types and values of firearms.

40. In my experience, most cellular telephones have digital cameras and video recording devices. Offenders sometimes use these cameras and video recorders to take pictures and videos of victims, stolen items, controlled substances, and firearms. Offenders may also photograph and video record their surroundings during the times that the criminal activities took place and/or during their travels to these locations. Such photographs and video recordings can be useful in determining the locations of criminal activities and items used in the commission of the criminal activities.

41. I also know, based on my training and experience, that many cellular telephones can connect to the wireless Internet service of residences and businesses that the users' frequent. I know that some cellular telephones and tablets have GPS devices. The IP addresses and the GPS information stored on the devices can be materially relevant in determining the locations of criminal activities and the travels to get to these locations.

42. Based on knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

## RECORDS FROM WIRELESS PROVIDERS

43. As detailed above, the following cellular telephone numbers were identified during the course of the investigation:

  a. **937-818-1476**: The number Adult Female A identified as being AZZALINA's cellular telephone number.

  b. **937-308-8902**: The number KARAS identified as being her cellular telephone number and the number KARAS's mother identified as being assigned to the **SUBJECT TELEPHONE**.

  c. **937-405-8316**: The number that Adult Male A identified as being his cellular telephone number.

44. A search warrant was authorized by the United States District Court for the Southern District of Ohio authorizing the search of the ZTE cellular telephone booked into AZZALINA's personal property at the Preble County Jail (as detailed above). Consistent with the information provided by Adult Female A, a preliminary examination of this telephone identified that the telephone number for the device was **937-818-1476**.

45. Based on my training and experience, I know that cell tower and sector information data can be materially relevant in investigations involving kidnapping, firearms, theft, and drug offenses. This information provides evidence of the types of travels taken by offenders when engaging in the criminal activities and helps in determining whether or

not a subject, witness, or victim was at the scene of a crime. Data regarding the subjects' or witness' whereabouts obtained from cell site information can corroborate statements and provide evidence of the locations of the criminal activities.

46. Also based on my training and experience, I know that transactional records such as incoming and outgoing call and SMS details provide evidence of the noted offenses. Such records provide information about who subjects communicate with, thereby providing information about communications with co-conspirators and victims.

47. I know that subscriber information, billing records, and customer service information maintained by telephone providers also provided material evidence of the above noted offenses. Such information is significant in that it helps in determining the identities of the users of the telephones.

## <u>NATURE AND MANNER OF EXECUTION</u>

48. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **SUBJECT TELEPHONE** and any other phones and recording devices recovered from the **SUBJECT PROPERTY** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

49. Because the warrants for the **SUBJECT PROPERTY** and **SUBJECT TELEPHONE** described in Attachments A-1 and A-2 only seek permission to examine items already in law enforcement's possession, the execution of these warrants does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrants at any time in the day or night.

50. Because the warrants for the telephone accounts described in Attachments A-3 and A-4 will be served on Verizon Wireless and Sprint Corporation, who will then compile the requested records at times convenient to those entities, reasonable cause exists to permit the execution of the requested warrants at any time in the day or night.

## **CONCLUSION**

51. I submit that this Affidavit supports probable cause for search warrants authorizing the searches of the property, telephone, and accounts described in Attachments A-1 through A-4 to seek the items described in Attachment B-1 through B-4.

Andrea R. Kinzig
Special Agent, FBI

Subscribed and sworn to before me
This 20th day of October, 2016

MICHAEL J. NEWMAN
United States Magistrate Judge

22

## ATTACHMENT A-4

### Property to Be Searched

Information associated with telephone number **937-818-1476** that is stored at premises controlled by Sprint Corporation, a company who accepts service of legal process at 6480 Sprint Parkway, Overland Park, Kansas, 66251.

**ATTACHMENT B-4**

**I.  Information to be disclosed by Sprint Corporation ("the Provider"):**

To the extent that the information described in Attachment A-4 is within the possession, custody, or control of the Provider, including any messages, records, files, logs, or information that have been deleted but are still available to the Provider or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A-4 for the time period of January 1, 2016 to the present:

a.      For all voice, SMS, and data activity:  All cell site and transactional information of all activity of the telephones and/or voicemail accounts described above, including log files, messaging logs, local and long distance telephone connection records, records of session times and durations, dates and times of connecting, methods of connecting, telephone numbers associated with outgoing and incoming calls, cell towers used, and other cell tower/sector records;

b.      All text messaging logs, including date and time of messages, and identification numbers associated with the handsets sending and receiving the message;

c.      All business records and subscriber information, in any form kept, pertaining to the individual accounts and/or identifiers described above, including subscribers' full names, addresses, shipping addresses, date account was opened, length of service, the types of service utilized, ESN (Electronic Serial Number), MSID, MDN, or other unique identifier for the wireless device associated with the account, Social Security number, date of birth, telephone numbers, and other identifiers associated with the account;

d.      Detailed billing records, showing all billable calls including outgoing digits;

e.      All payment information, including dates and times of payments and means and source of payment (including any credit or bank account number);

f.      Incoming and outgoing telephone numbers;

g.      All records indicating the services available to subscribers of individual accounts and/or identifiers described above;

h.      All records pertaining to communications between the Provider and any person regarding the account or identifier, including contacts with support services and records of actions taken.

## II. Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. §371 (Conspiracy), 18 U.S.C. §1201 (Kidnapping), 18 U.S.C. §924(c) (Use of a Firearm During and in Relation of a Crime of Violence), 18 U.S.C. §922(g) (Possession of a Firearm by a Prohibited Person), 18 U.S.C. §2312 (Interstate Transportation of Stolen Vehicles), 18 U.S.C. §2313 (Receipt, Possession, Storage, Concealment, Barter, Sale, and Disposal of Interstate Stolen Vehicles), 21 U.S.C. §844 (Possession of Controlled Substances), and 18 U.S.C. §1512 (Tampering with a Witness, Victim, or an Informant), from January 1, 2016 to the present, including, for each account or identifier listed on Attachment A-4, information pertaining to the following matters:

(a) Telephone numbers of those with whom the user communicated, both via telephone calls and text messages.

(b) Dates, times, and other transactional information associated with the telephone calls and text messages.

(c) Any cell site and location information identifying the whereabouts of the user.

(d) Any payment information, including credit card numbers.

(e) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

## **Attachment C-4**

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §371 | Conspiracy |
| 18 U.S.C. §1201 | Kidnapping |
| 18 U.S.C. §924(c) | Use of a Firearm During and in Relation of a Crime of Violence |
| 18 U.S.C. §922(g) | Possession of a Firearm by a Prohibited Person |
| 18 U.S.C. §2312 | Interstate Transportation of Stolen Vehicles |
| 18 U.S.C. §2313 | Interstate Sale or Receipt of Stolen Vehicles |
| 18 U.S.C. §844 | Possession of Controlled Substances |
| 18 U.S.C. §1512 | Tampering with a Witness, Victim, or an Informant |